# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

Convergent Nonprofit Solutions, LLC,

        CNS,

                                        CASE NO.: _____

vs.

Carol Wick, Carol Wick Consulting, LLC,
and Sharity, Inc.,

        Defendants.

_____/

## VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

     Plaintiff Convergent Nonprofit Solutions, LLC ("Plaintiff" or "CNS"), by and through the undersigned counsel, brings this Verified Complaint for Injunctive and Other Relief against former CNS principal and partner Carol Wick ("Wick"), Wick's company and former CNS member, Carol Wick Consulting, LLC ("CWC"), and Wick's new company, Sharity, Inc. ("Sharity") (Wick, CWC, and Sharity collectively, "Defendants"), and in support states:

## NATURE OF THE ACTION

     1.    This action asserts claims of breach of fiduciary duty, breach of contract for violations of valid and enforceable confidentiality and restrictive covenant agreements, tortious interference with contractual and advantageous business relationships, violations of the Florida Uniform Trade Secrets Act, violations of the Defend Trade Secrets Act of 2016, violations of the Computer Fraud and Abuse Act, conversion, civil conspiracy, and aiding and

abetting breach of fiduciary duty, against a former principal and partner of CNS, former member of CNS, and their new business.

2.     This case arises out of Wick and CWC's theft – while serving as principal, partner, and member of CNS – of CNS's confidential and proprietary information and trade secrets, and the use of such misappropriated confidential and proprietary information and trade secrets to unlawfully solicit CNS's customers and business on behalf of, with the assistance of, and for the benefit of, Wick's new competing business Sharity, in violation of certain restrictive covenants with CNS and/or applicable law, and in violation of their non-compete Agreement.

3.     Sharity has knowingly accepted the benefits of Wick and CWC's illegal conduct, and has conspired with and directly facilitated Wick and CWC's breach of their legal obligations to CNS, and Defendants continue to engage in wrongful conduct in violation of contractual, statutory, and common law obligations to CNS, causing irreparable harm and significant damages to CNS.  To cease and prevent ongoing irreparable harm arising from Defendants' conduct, CNS seeks preliminary and permanent injunctive relief, as well as monetary damages and other available relief.

## **PARTIES**

4.     CNS is a Delaware limited liability company with offices in Orlando, Florida, Atlanta, Georgia, and Raleigh, North Carolina.  CNS's members are individuals and entities who are citizens of the state of Florida, Georgia, North Carolina, and South Carolina.

5.     Wick is an individual residing at 1035 Silver Palm Lane, Maitland, Florida 32751.

6.      Wick was a principal of CNS and worked for CNS as a partner and Head of Asking Rights Division until she was terminated for cause on May 24, 2019.  Within 30 days of Wick's termination, CNS also discovered further evidence, including the wrongful conduct set forth in this Complaint, which further substantiates Wick's termination for cause.

7.      Upon information and belief, CWC is a Florida for-profit limited liability company, with its principal place of business located at 1035 Silver Palm Lane, Maitland, Florida 32751.  CWC may be served with process through its registered agent, David Rickey at 20 N. Orange Avenue, Unit 1600, Orlando, FL 32801.

8.      Upon information and belief, Sharity is a Florida for-profit corporation, with its principal place of business located at 1035 Silver Palm Lane, Maitland, Florida 32751.  Sharity may be served with process through its registered agent, David Rickey at 20 N. Orange Avenue, Unit 1600, Orlando, FL 32801.

## JURISDICTION AND VENUE

9.      The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over all Defendants as follows:

    a.   The Court has personal jurisdiction over Wick because she is a citizen of the State of Florida.

    b.   This Court has personal jurisdiction over CWC and Sharity because these companies operated under common ownership and control, and committed tortious acts aimed at CNS in the State of Florida and caused injury to CNS

in the State of Florida.  In addition, they conduct business in the State of

Florida and have purposely availed themselves to this Court's jurisdiction.

11.     Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c) because

Wick resides in Orange County, Florida, and CWC and Sharity have substantial business

operations in this District, many of the clients Wick and CWC were servicing while working

for CNS are located in this District, and the harm to CNS and breach occurred, and continues

to occur, in this District.

### CNS'S LEGITIMATE BUSINESS INTERESTS

12.     CNS is a leading capital campaign consulting firm specializing in national

nonprofit fundraising.

13.     CNS is a comprehensive solutions company with services that include

addressing nonprofit clients' organizational, resource development, and sustainability

fundraising needs throughout the state of Florida and across state lines to CNS's clients.

14.     The nonprofit fundraising market is highly competitive, and CNS's success in

the industry depends largely on its trade secrets and proprietary and confidential information,

as well as the relationships and good will it has developed with its clients and prospective

clients.

15.     CNS has expanded substantial time, money and effort in developing its services,

professional reputation, good will, and business networks.  In doing so, CNS has developed

trade secrets and valuable confidential information, including without limitation, client lists

and information, marketing plans and strategies, proposals, sales strategies and techniques,

sales and pricing information, invoicing, profit margins, project and opportunity analyses and

data, accountability charts, organization information, comparison data, pipelines, corporate initiatives, company meeting information and agendas, team agreements, policies and SOPs, and principal contracts.

16.     CNS relies on a foundation of trust and loyalty between CNS and its principals, partners, and members to promote the business model.

17.     CNS also makes significant efforts to protect its legitimate business interests including, but not limited to, entering into partnership and restrictive covenant agreements that include, among other fiduciary and protective covenants, confidentiality, non-competition, and non-solicitation provisions, with certain principals and members, including Wick and CWC. Such measures are common and reasonable within CNS's industry.

18.     The measures CNS takes to protect the confidentiality of information further include, but are not limited to, steps such as ensuring that all business software, applications, and other cloud-based programs require log-in authentication, some even requiring two-step authentication. Principals, partners, members, and employees are required to hold the company's confidential information, and the confidential information of third parties in CNS's possession, in the strictest confidence. Principals, partners, and members of CNS have varying levels of access to proprietary software, applications and cloud-based programs, all of which is based on whether they have a legitimate business need to access that level of information. CNS's IT provider Electric provides an extra layer of security as it can provide audits on users who access CNS's information systems.

19.     CNS's confidential and proprietary information derive independent economic value from not being generally known to the public and not being readily ascertainable by

proper means and have been subject to efforts that are reasonable under the circumstances to maintain their secrecy.

20.     The confidential and proprietary information described in the preceding paragraphs are CNS's trade secrets.

21.     Much of the economic benefit to CNS from this information stems from its confidential nature, because if CNS's trade secrets were to become known to competitors, CNS would lose the competitive advantage afforded it by this information.

22.     CNS expended substantial time, effort, money and resources in developing and maintaining its trade secrets.

23.     CNS's legitimate business interests include, but are not limited to, confidential and proprietary information, trade secrets, market share in the industry, relationships with clients and prospective clients, financial institutions, referral sources, and employees, and CNS's reputation and goodwill in the industry.

## **WICK**

24.     In her position with CNS, Wick was responsible for developing and interacting with clients and prospective clients to increase CNS's sales.  In the course of her duties for CNS, Wick was entrusted with and acquired substantial knowledge of CNS's trade secrets and confidential and proprietary information.

25.     Wick, by virtue of her principal and partner relationships with CNS, was an agent and had a fiduciary duty not to disclose CNS's confidential and proprietary information and trade secrets for her own benefit, or for another's benefit, to CNS's detriment, and to at all times act in the best interests of CNS and not to engage in activities that would injure CNS.

## CWC

26.     CWC was formed on or about May 20, 2016.

27.     Upon information and belief, Wick is the principal officer of CWC.

28.     CWC was a corporate member of CNS.

## SHARITY

29.     Sharity was formed on or about May 28, 2019 and advertises as "empowering nonprofits" by providing fundraising services to nonprofit organizations.

30.     Wick is listed as the Chief Executive Officer Sharity.

## THE AGREEMENT

31.     Wick and CWC entered into a Proprietary Information, Inventions, Non-competition, and Non-solicitation Agreement with CNS on August 31, 2017, with an effective date of July 1, 2017 (the "Agreement"), attached as Exhibit A.  Under the Agreement, the terms "I," "my" and "me" are deemed to include Wick and CWC, and all of CWC's consultants, employees, directors, officers, managers and other agents.  *See* Exhibit A, at 5, ¶13.3.

32.     Under the Agreement, Wick and CWC agreed to certain confidentiality, non-competition, and non-solicitation provisions in exchange for valuable consideration, including compensation paid, the issuance of Shares of Membership Interest in CNS, and access to the Company's confidential and proprietary information, which was provided by CNS after execution of the Agreement.  *Id.*, at 1, Introduction.

33.     Specifically, the Agreement provides in part:

**NONDISCLOSURE (Recognition of Company's Rights; Nondisclosure).**

> I recognize that all Proprietary Information (as defined below) is and shall remain the sole and exclusive property of the Company. At all

> times during my employment and thereafter, I will hold in strictest confidence and will not disclose or use any Proprietary Information, except as such disclosure or use may be required in connection with my work for the Company or unless the Company expressly authorizes such disclosure or use in writing.  I will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information. I will take all reasonable precautions to prevent the inadvertent or accidental disclosure of Proprietary Information. If I am ever requested or required by subpoena, court order, or similar process to disclose any Proprietary Information, I agree that I will provide the Company with immediate notice of such request(s) for subpoena, court order, or similar process so that the Company may take appropriate action.

Exhibit A at pg. 1, ¶1.1.[1]

34.     Wick and CWC further promised the Agreement that they would maintain the confidentiality of any confidential or proprietary third party information in CNS's possession or control.  *Id.*, at 2, ¶1.3.

35.     Wick and CWC also agreed not to work for any other entity while working for CNS and, for two years after their separation from CNS, not to solicit any current or former employee of CNS, or solicit or service any current, former, or prospective customer or client of CNS:

**NO CONFLICTS OR SOLICITATION.**

> To protect the Company's Proprietary Information, I agree that during the period of my employment by the Company I will not, without the Company's express written consent, enter into any other employment or business activity for myself or with any other person or entity, except as set forth in Section 3 of Exhibit A attached hereto (which disclosure does not constitute an exception or waiver of other provisions of this Agreement, including without limitation, Section 4 below). I also agree that for the period of my employment by the Company and for two

---

[1] For purposes of the Agreement the term "employment," or any variation thereof, shall be deemed to include "engagement" or any variation thereof. *Id.*, at 5, ¶13.3.

(2) years after the date of termination of my employment with the Company I will not, either directly or through others: (a) solicit, induce or attempt to solicit or induce any person or entity who is currently, or was at any time during the one (1) year period of time preceding the date my employment terminated with the Company, an employee of, independent contractor to, consultant to or other service provider to the Company (*"Service Provider"),* to terminate his or her relationship with the Company; (b) hire or attempt to hire any Service Provider of the Company as an employee, independent contractor or consultant to or for myself or others; (c) solicit or attempt to solicit (i) any customer to which the Company sold any product, or for which the Company performed any service, within two (2) years prior to the termination of my employment with the Company; or (ii) any prospective customer that the Company called on at any time within two (2) years prior to the termination of my employment with the Company (collectively, a *"Company Customer");* or (d) provide products or services competitive with a product or service of the Company to any Company Customer.

*Id.*, at 3, ¶3.

36.     Wick and CWC also agreed that if any restriction set forth above is found to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall extend only over the maximum period of time, range of activities or geographic area as to which such court shall determine it to be enforceable.  *Id*.

37.     Wick and CWC also agreed not to compete with CNS while working for CNS and for two years after their separation from CNS:

**COVENANT NOT TO COMPETE.**

To protect Proprietary Information, I agree that during my employment with the Company and for a period of two (2) years after my last day of employment with the Company, I will not directly or indirectly engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest in, or participate in the financing, operation, management or control of, any person, firm, corporation or business that engages in a Restricted Business in a Restricted Territory (each as defined below). It is agreed that ownership of no more than one percent (1%) of the outstanding

9

> voting stock of a publicly traded corporation shall not constitute a violation of this provision.

*Id.*, at 4, ¶4.

38.     For the purposes of the restrictive covenants, "Restricted Business" is defined as "(i) any business related to providing fundraising services to nonprofit organizations; and (ii) any other business that the Company is actively engaged in researching, developing or marketing at the time of the termination of my employment, provided that this clause (ii) shall only apply if I am involved with the research, development, or marketing of that other business." *Id.*, at 4, ¶4.2(a).

39.     Sharity is a direct competitor of CNS that provides fundraising services to nonprofit organizations, and thus, is a Restricted Business. *See id.*, at 4, ¶4.2(a).

40.     "Restricted Territory" is defined as anywhere in the world; or, if that territory is deemed overbroad by the court, as otherwise blue-penciled by the court by striking through that clause and any progressively more narrowly tailored territory clauses provided in the Agreement, until the court determines that the Restricted Territory is reasonable. *Id.*, at 4, ¶4.2(b). Wick worked for CNS customers and clients throughout the United States and one or more U.S. territories, and in other countries including Kenya, Greece, and Haiti.

41.     Wick and CWC further agreed that the time limitation on the restrictions in this non-compete provision, combined with the geographic scope, is reasonable. *Id.*, at 4, ¶4.1.

42.     Wick and CWC also agreed to return all Company property and proprietary information to CNS upon their separation from CNS. *Id.*, at 5, ¶8.

43.     The restrictive covenants contained in the Agreement were narrowly tailored to protect CNS's legitimate business interests in protecting its confidential and proprietary

information, trade secrets, reputation and goodwill, and its market share within its industry.

*See id.*

44.     CNS has legitimate business interests in prohibiting Wick and CWC from using and disclosing CNS's confidential and proprietary information and trade secrets.

45.     CNS has legitimate business interests in prohibiting Wick and CWC from soliciting employees and customers/clients for a period of two (2) years following her separation from CNS.

46.     CNS has legitimate business interests in prohibiting Wick and CWC from working for a direct competitor for a period of two (2) years following her separation from CNS.

47.     Wick and CWC further agreed as follows:

**LEGAL AND EQUITABLE REMEDIES**

> Because my services are personal and unique, because I will have access to and become acquainted with the Proprietary Information and because the Company would not have an adequate remedy at law for the breach or threatened breach of this Agreement, I expressly consent to the enforcement of this Agreement and any of its provisions by temporary restraining order, preliminary injunction, permanent injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

*Id.*, at 5, ¶10.

## **DEFENDANTS' ILLEGAL CONDUCT**

48.     Wick and CWC were provided CNS's confidential, proprietary, and trade secret information as part of their role for CNS.

49.     During at least the early months of 2019, Wick's relationship with CNS began to erode and Wick's termination became imminent.

50.     Upon information and belief, seeing the writing on the wall, Wick, individually and as an agent of CWC, operated in a wholesale effort to misappropriate CSN's confidential, proprietary, and trade secret information during, at least, February, March, April, and May of 2019, and potentially earlier than that.

51.     In fact, on or about March 11, 2019 Wick told Tom Ralser, CNS principal and Chartered Financial Analyst, that she intended to leave CNS, take CNS's clients, take CNS's personnel, and either go to a competitor or become one.  *See* June 21, 2019 Declaration of Tom Ralser, attached as Exhibit B.

52.     Upon information and belief, in the months of March, April, and May of 2019 leading up to her termination, Wick, individually and as an agent of CWC, previewed and downloaded massive amounts of CNS's confidential information and trade secrets to her drop box, including, but not limited to, corporate administration documents, such as corporate initiatives, meeting information and agendas, team agreements, Company organizational charts, policies and SOPs; client data, such as contact lists, proposals and negotiations, sales, project and opportunity analyses and data, invoicing, accountability charts, organization information, comparison data, pipelines; and personnel records for other principals of CNS, including contract information.  There was no legitimate business reason for Wick to have uploaded such information to the drop box during this time period.

53.     Additionally, Wick, individually and as an agent of CWC, emailed confidential information and trade secrets to herself, often copying on those emails a third party, Saso Venovski, who is, upon information and belief, Wick's fiancé.

54.     By way of just a few or many examples, as early as November 11, 2018, Wick emailed Venovski the following sensitive documents: CNS's Feasibility Study GANTT chart (study timeline - Trade Secret, Intellectual Property); How to Conduct Interviews in Study - Principal Notes (Trade Secret, Intellectual Property); CDC of Tampa Prospectus (Draft project plan - Trade Secret, Confidential Information, Intellectual Property); CDC of Tampa Opportunity Analysis (Feasibility study report - Trade Secret, Confidential Information, Intellectual Property); Project Director Onboarding (Procedural steps for new hires - Trade Secret, Intellectual Property); CNS Field Handbook (Instructional book for new hires - Trade Secret, Intellectual Property).

55.     On January 13, 2019, Wick emailed Venovski a former CNS employee's exit interview.

56.     On February 23, 2019, Wick emailed Venovski sensitive company information provided by a prospective CNS customer

57.     On February 28, 2019, Wick emailed Venovski CNS's Asking Rights Comp Structure Framework.

58.     On March 15, 2019, Wick emailed Venovski an email thread between Wick and CNS principals Mark Bergethon and Tom Ralser, and CNS's HR counsel Johnny Duncan regarding CNS human resources matters.

59.     On May 3, 2019, Wick emailed Venovski CNS's April 2019 Comp Sheet.

60.     There was no legitimate business reason for Wick to email these documents to herself and Venovski.

61.     Upon information and belief, in the days leading up to her anticipated termination Wick, individually and as an agent of CWC, engaged in calculated activities to wholesale delete the entire contents of her CNS email account in an effort to conceal these illegal actions.

62.     CNS's review of Wick's email account post-termination revealed that her account had been purged of virtually all inbox items, all sent items between May 2019 and 2017, and all deleted items.  CNS had not authorized this deletion.   There was no legitimate business reason for Wick to delete virtually the entire contents of her email account.

63.     Upon information and belief, immediately following Wick's termination from CNS, Wick and CWC began working for Sharity in the same capacity and the same territory in which they worked for CNS, in violation of the Agreement.

64.     Upon information and belief, upon their departure from CNS, in violation of the Agreement and their statutory and common law duties to CNS, Wick, individually and as an agent of CWC, accessed, shared, retained, and are using CNS's misappropriated confidential information and trade secrets, on behalf of themselves and Wick's new company Sharity, to compete with CNS.

65.     Upon information and belief, Wick and CWC are soliciting CNS's current, former, and prospective customers and clients, in violation of the Agreement.   Upon information and belief, not only are Wick and CWC soliciting CNS's customers with whom

they worked while with CNS, but also current, former, and prospective customers of other CNS principals.

66.     For example, the Sharity website contains testimonials from at least three of CNS's customers: Freedom Ride, Family Promise, and Base Camp Children's Cancer Foundation.  (https://sharityglobal.com).  Those testimonials refer to "Carol Wick's" non-profit knowledge, and that Wick "already know[s] the people and players in the particular landscape . . . ." *Id.*

67.     Upon information and belief, Wick and CWC are continuing to breach their restrictive covenants on behalf of themselves and as an agent of Sharity to advance their own pecuniary interests, as well as those of their new employer.

68.     Upon information and belief, Sharity has direct and constructive knowledge of CNS's restrictive covenant agreements with Wick and CWC because, as the CEO of Sharity, Wick's knowledge is imputed upon Sharity, and because the restrictive covenants at issue in this case are customary in the industry.

69.     Upon information and belief, Sharity knowingly and intentionally encouraged Wick and CWC to violate their restrictive covenants in order to interfere with CNS's business and unlawfully compete in the marketplace.

70.     Upon information and belief, Wick and CWC conspired with Sharity to breach their contractual, statutory, and common law duties to CNS, to irreparably harm and damage CNS.

71.     Upon information and belief, Defendants conspired to engage in a scheme of unfair and unlawful competition against CNS and to advance their position in the marketplace.

72.     Sharity knew or should have known that its plan to induce and assist Wick and CWC was unlawful and would result in injury to CNS.

**CAUSES OF ACTION**

**COUNT I**

**Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Wick and CWC)**

73.     CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

74.     During their employment with CNS, Wick and CWC had access to confidential and proprietary information.

75.     CNS's confidential and proprietary information are trade secrets under 18 U.S.C. § 1839(3) because they derive independent economic value, actual or potential, from not being generally known to, and not readily ascertainable through proper means, by competitors of CNS and because CNS has taken reasonable measures to keep such information secret.

76.     CNS provides services to clients across state lines and CNS's trade secrets are related to services used in interstate commerce.

77.     As more fully described above, CNS takes reasonable measures to protect the secrecy of such information.   These measures include password protected databases, confidentiality and non-disclosure agreements, and limitations on dissemination of information on a need-to-know basis.

78.     Wick and CWC knew they had a duty to maintain the secrecy of CNS's trade secrets due, in part, to their acknowledgments in the Agreement.

16

79.     Wick and CWC had a duty not to disclose or use misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

80.     Prior to the termination of Wick's principal/partner relationship with CNS, Wick and CWC misappropriated CNS's trade secrets by wrongfully obtaining, compiling, maintaining, and/or distributing documents and/or electronically stored information that includes CNS's trade secrets, including clients, pricing and business strategy information, sales strategies and techniques, marketing strategies and information, and other financial information, among other things discussed above.

81.     Upon information and belief, Wick and CWC have used CNS's trade secrets to aid Wick, CWC, and Sharity to improperly solicit CNS's current, former, and prospective clients and compete with CNS.

82.     Wick and CWC's actions constitute a violation of 18 U.S.C. § 1836, *et seq*.

83.     Wick and CWC's misappropriation of CNS's trade secrets was willful and malicious under 18 U.S.C. § 1836(b)(3)(C).

84.     Wick and CWC have been unjustly enriched as a proximate result of their misappropriation and use of CNS's trade secrets.

85.     CNS lacks an adequate remedy at law and is entitled to preliminary and permanent injunctive relief enjoining Wick and CWC's unlawful use and misappropriation.

86.     To the extent that Wick and CWC have already provided CNS's trade secrets or other confidential information to third parties, those parties should also be ordered to return and/or destroy that information.

87.     CNS is further entitled to actual damages and disgorgement of amounts by which Wick and CWC were unjustly enriched, in amounts to be proven at trial, as well as punitive and/or exemplary damages.

88.     CNS has retained the Ogletree Deakins law firm to represent it in this action and is entitled to recover reasonable attorneys' fees and litigation costs to full extent allowed under law.

## COUNT II

### Violation of the Florida Uniform Trade Secrets Act
### (Against Wick and CWC)

89.     CNS repeats and reasserts the allegations set forth paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

90.     While employed with CNS, Wick and CWC had access to CNS's confidential and proprietary information including, clients, pricing and business strategy information, sales strategies and techniques, marketing strategies and information, and other financial information, among other things discussed above.

91.     CNS expended substantial time, effort, money and resources in developing and maintaining its confidential and proprietary information.

92.     CNS takes reasonable, affirmative measures to maintain the confidentiality of this information for its exclusive benefit and competitive advantage in the industry.

93.     This confidential and proprietary information is CNS's trade secrets.

94.     Wick and CWC had a duty not to disclose CNS's trade secrets for their own benefit, or for the benefit of another, to the detriment of CNS.

95.     Upon information and belief, Wick and CWC wrongfully disclosed the trade secrets to, at least, Sharity and Wick's fiancé Venovski, and used the trade secrets, without CNS's express or implied consent, to advance their own pecuniary interests, in violation of their restrictive covenants and Florida law.

96.     Upon information and belief, Wick and CWC used CNS's trade secrets to solicit CNS's clients and prospective clients to purchase competitive products and/or services.

97.     Upon information and belief, Wick and CWC continue to wrongfully disclose and use CNS's trade secrets, without CNS's express or implied consent, to advance their own pecuniary interests and those of Sharity.

98.     Wick and CWC's actions were and continue to be willful and malicious.

99.     Unless Defendants are enjoined from using the subject trade secrets, CNS will suffer immediate and irreparable injury in that Defendants will continue to have access to and the ability to make use of CNS's trade secrets for financial gain.

100.    As a direct and proximate result of Wick and CWC's misappropriation of CNS's trade secrets, CNS has suffered, and will continue to suffer, irreparable harm and economic damages.

101.    CNS lacks an adequate remedy at law and is entitled to preliminary and permanent injunctive relief enjoining Wick and CWC's unlawful misappropriation.

102.    In addition to injunctive relief, under Florida law, CNS is entitled to recover actual damages, damages for unjust enrichment, punitive and/or exemplary damages, and attorneys' fees as a result of Wick and CWC's misappropriation.

103.    CNS has retained the Ogletree Deakins law firm to represent it in this action and is entitled to recover reasonable attorneys' fees and litigation costs to full extent allowed under law.

## COUNT III

### Breach of Contract
### (Against Wick and CWC)

104.    CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Complaint and incorporates them herein by reference.

105.    The Agreement is a valid and enforceable contracts and based on sufficient consideration.

106.    The Agreement prohibits Wick and CWC from using or disclosing CNS's confidential information.

107.    The Agreement prohibits Wick and CWC from soliciting CNS's current, former, or prospective customers or clients in the relevant geographic territory defined in the Agreement for a period of two years following the end of their employment with CNS.

108.    The Agreement prohibits Wick and CWC from competing with CNS in the relevant geographic territory defined in the Agreement for a period of two years following the end of their employment with CNS.

109.    Sharity is a direct competitor and Restricted Business under the Agreement.

110.    CNS fully performed its obligations under the Agreement.

111.    Wick and CWC knowingly, intentionally, and materially breached the terms of the Agreement by, among other things, retaining and disclosing and using CNS's confidential information and trade secrets.

112.     Wick and CWC knowingly, intentionally, and materially breached the terms of the Agreement by, among other things, soliciting and conspiring to solicit CNS's clients.

113.     Wick and CWC knowingly, intentionally, and materially breached the terms of the Agreement by, among other things, working for a Restricted Business in the same capacity and territory for which they worked for CNS.

114.     CNS has been and continues to be damaged by Wick and CWC's improper and unlawful actions in breaching the Agreement.

115.     CNS is entitled to an injunction restraining Wick and CWC, and all others acting in concert with them, from engaging in activities that violate the contractual obligations undertaken by Wick and CWC.

116.     CNS is also entitled to an award of damages incurred as a result of Wick and CWC' material breaches of their contractual obligations, in an amount to be determined at trial.

## COUNT IV

**Conversion**
**(Against Wick and CWC)**

117.     CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

118.     Prior to and/or following the end of Wick' principal/partner relationship with CNS, Wick and CWC intentionally misappropriated certain trade secrets and confidential business information that is CNS's property, in order to use such property to unfairly compete with CNS.

119.    Wick and CWC have, without authority or justification, assumed and exercised the right of ownership of CNS's property, as described above, and by their actions concurrently has denied CNS access to its own property.

120.    The conversion of CNS's property by Wick and CWC was and is willful and malicious.

121.    CNS has been damaged as a proximate result of the conversion of its property by Wick and CWC.

## COUNT V

### Tortious Interference with CNS's Contractual and Advantageous Business Relationships (Against Sharity)

122.    CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

123.    CNS has a valid and enforceable Agreement with Wick and CWC.

124.    CNS has advantageous business relationships with its customers and prospective customers under which CNS has rights.

125.    CNS has legitimate and protectable interests in its contractual and advantageous business relationships with Wick and CWC, and its customers and prospective customers.

126.    Sharity knew that CNS has a valid and enforceable Agreement with Wick and CWC, and advantageous business relationships with its customers and prospective customers.

127.    Sharity encouraged and induced Wick and CWC to violate their Agreement with CNS to advance Defendant's pecuniary interests.

128.    Sharity encouraged and induced CNS's customers and prospective customers, including Freedom Ride, Family Promise, and Base Camp Children's Cancer Foundation, to divert their business relationships from CNS to Sharity to advance Defendant's pecuniary interests.

129.    Sharity's interference was without justification or privilege, and malicious.

130.    Sharity's actions are ongoing.

131.    As a result of Sharity's tortious interference with CNS's contractual and advantageous business relationships with Wick, CNS has suffered, and will continue to suffer, irreparable harm and economic damages.

## COUNT VI

### Breach of Fiduciary Duty
### (Against Wick)

132.    CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

133.    As a principal and partner of CNS, Wick owed CNS a fiduciary duty that required her, while working for CNS, to refrain from acting against CNS's best interest.

134.    Wick's fiduciary duty also requires that, even after termination of employment, she not use or disclose CNS's confidential and proprietary information or trade secrets.

135.    Wick breached her fiduciary duty to CNS by engaging in conduct which included, but is not limited to, misappropriating CNS's trade secrets and confidential and proprietary information while still working for CNS and otherwise acting against the interest of CNS.

136.     As a direct and proximate consequence of Wick's wrongful conduct, CNS has and will continue to suffer monetary damages, in an amount to be determined at trial.

137.     As a direct and proximate consequence of Wick's wrongful conduct, she has exposed CNS to irreparable and incalculable harm.

138.     Wick's actions are intentional, willful, wanton, and reckless and are calculated to harm CNS in its business affairs.

## COUNT VII

### Civil Conspiracy
### (Against All Defendants)

139.     CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

140.     Defendants entered into an agreement with each other to commit the unlawful acts alleged in this action.

141.     Defendants engaged in overt acts in furtherance of their conspiracy or they knew of the scheme and assisted in some way.

142.     Defendants' underlying civil wrongs include all claims alleged in this Complaint.

143.     Defendants' civil conspiracy proximately caused CNS to suffer damages, including, but not limited to, lost profits.

## COUNT VIII

### Computer Fraud and Abuse Act
### (Against Wick)

144.    CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 of the Verified Complaint and incorporates them herein by reference.

145.    The secure data network on which CNS maintained and currently maintains certain trade secrets, confidential information, and/or other proprietary information in electronic form exclusively for authorized users is a network of computers used in interstate commerce.

146.    The only principals, partners, members, and employees who are allowed to access CNS's computer networks, system, drop box, and equipment are CNS's current principals, partners, members, and employees who are accessing such for proper business purposes.

147.    Wick exceeded her access to CNS's computer systems by violating her fiduciary duty and the terms of the Agreement to protect, maintain the confidentiality of, and return to CNS at termination confidential and proprietary information and trade secrets, by unauthorized use of CNS's drop box, and/or by wholesale deleting her email accounts without authorization.

148.    Upon information and belief, Wick' mass deletion of email was to conceal her wrongful conduct.  These deletions were without authorization and lacked any legitimate business purpose.

149.    By means of the conduct described above, Wick intentionally accessed CNS's computer network and drop box without authorization and/or exceeded her authorization, and as a result of such conduct, caused damage and loss to CNS.

150.    Wick engaged in the conduct described above for her own personal benefit as well as the benefit of CNS's competitor Sharity.

151.    CNS has suffered damages and loss by reason of, and as a proximate result of, Wick' conduct in violation of the Computer Fraud and Abuse Act described above, and the value of such loss to CNS exceeds $5,000.00 for a one-year period.

## COUNT IX

### Aiding and Abetting Breach of Fiduciary Duty
### (Against CWC and Sharity)

152.    CNS repeats and reasserts the allegations set forth in paragraphs 1 through 72 and paragraphs 132 to 138 of the Verified Complaint and incorporates them herein by reference.

153.    By virtue of her principal and partner relationship with CNS, Wick owed CNS a fiduciary duty at all times to act in the best interests of CNS and not to engage in activities that would injure CNS.

154.    As described above, Wick breached her fiduciary duty to CNS by, among other things, subordinating CNS's interests to her own and acting in the best interest of herself and others, including Sharity, CNS's direct competitor, while still a principal and partner of CNS.

155.    Upon information and belief, CWC and Sharity had knowledge that Wick owed a fiduciary duty to CNS because, among other reasons, CWC and Sharity were aware of Wick' role as principal and partner for, and agreements with, CNS.

156.    Upon information and belief, CWC and Sharity knowingly and purposefully, without privilege, participated in Wick' breaches of her fiduciary duty by, among other actions, helping Wick prepare for her efforts to misappropriate CNS's Confidential Information and to usurp business opportunities and solicit CNS's customers on behalf of Sharity, and divert CNS business to Sharity, while still a principal and partner of CNS.

157.    Upon information and belief, CWC and Sharity conspired with Wick to induce, encourage, and procure Wick' breach of her fiduciary duty.

158.    As a direct and proximate result of CWC and Sharity's aiding and abetting of Wick' breach of fiduciary duty, CNS has been damaged in an amount to be proven at trial.

159.    CWC and Sharity's aiding and abetting of Wick' breach of her fiduciary duty was willful and malicious, thus entitling CNS to an award of punitive or exemplary damages

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CNS respectfully requests that the Court enter an Order and Judgment in its favor and against Defendants and award CNS the following relief:

(A)    A preliminary and permanent injunction prohibiting Defendants from further taking, acquiring, disclosing, using in any way, otherwise misappropriating, or attempting to do any such thing with CNS's property, including, but not limited to, CNS's trade secrets and confidential business information;

(B)    A preliminary and/or permanent injunction prohibiting Defendants from competing unfairly with CNS based in any way on their knowledge and/or use of CNS's property or trade secrets;

(C)     A preliminary and/or permanent injunction prohibiting Wick and CWC from engaging in activities that violate their contractual obligations to CNS contained in the Agreement, including, their restrictive covenants.

(D)     A preliminary and/or permanent injunction prohibiting Defendants from wrongfully interfering with CNS's contracts and/or business relationships with its clients and prospective clients, vendors, suppliers, and employees;

(E)     A preliminary and/or permanent injunction prohibiting Defendants from communicating with any clients of CNS, including, but not limited to, all CNS clients Defendants took from other principals, partners, members, or employees of CNS when Wick misappropriated their information;

(F)     A preliminary and/or permanent injunction compelling Defendants to return and restore all of CNS's property, including, but not limited to, CNS's trade secrets and confidential business information (and all reproductions thereof) to CNS;

(G)     A preliminary and/or permanent injunction prohibiting continued use of Defendant Sharity's website: https://sharityglobal.com;

(H)     Requiring Wick to submit for inspection to counsel for CNS all electronic devices, including, but not limited to, laptops, tablets, and mobile devices, used during her disloyal period and after leaving CNS;

(I)     Monetary damages, including, but not limited to, compensatory damages, disgorgement of amounts by which Defendants were unjustly enriched, and exemplary and/or punitive damages;

(J)     Pre and post-judgment interest;

(K)     CNS's attorneys' fees and costs and expenses incurred in conjunction with this suit; and

(L)     Such other and further relief as the Court deems just and proper.

DATED:     June 21, 2019

Respectfully submitted,

*/s/  Kevin D. Zwetsch*
Kevin D. Zwetsch
Florida Bar No.: 0962260
E-mail: kevin.zwetsch@ogletree.com
Secondary email: elba.chinea@ogletree.com
J. Robert McCormack
Florida Bar No.: 864791
E-mail: bob.mccormack@ogletree.com
Secondary email: angela2.jackson@ogletree.com
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
100 North Tampa Street, Suite 3600
Tampa, FL 33602
Telephone: (813) 289-1247
Facsimile:  (813) 289-6530

*ATTORNEYS FOR PLAINTIFF*

**STATE OF FLORIDA**

_Orange_   **COUNTY**

## VERIFICATION

I, _Mark Bergethon_, am the _Principal / Team Relations Director_

for Convergent Nonprofit Solutions, LLC.  I am over eighteen (18) years of age.  I declare

under penalty of perjury that the factual allegations contained in the foregoing Verified

Complaint for Injunctive and Other Relief are true and correct and that the basis of my

knowledge, information and belief is personal knowledge, and information shared with me in

the course of my business activities.

_____
Signature

_Mark Bergethon_
_____
Name

_Principal_
_____
Title

_June 21, 2019_
_____
Execution Date